No. 21-35473

# In the United States Court of Appeals
# For the Ninth Circuit

———————————————

CASEY CLARKSON, on behalf of himself and all others similarly situated,
*Plaintiff-Appellant,*

v.

ALASKA AIRLINES, INC., and HORIZON INDUSTRIES, INC.,
*Defendants-Appellees.*

———————————————

On Appeal from the United States District Court
for the Eastern District of Washington, Spokane
Case No. 2:19-cv-0005 (The Honorable Thomas O. Rice)

———————————————

## PLAINTIFF-APPELLANT'S OPENING BRIEF

———————————————

R. JOSEPH BARTON
COLIN M. DOWNES
BLOCK & LEVITON LLP
1633 Connecticut Ave. NW, Suite 200
Washington, DC 20009
(202) 734-7046

VINCENT CHANG
BLOCK & LEVITON LLP
100 Pine Street, Suite 1250
San Francisco, CA 94111
(415) 968-8999

DEEPAK GUPTA
JONATHAN E. TAYLOR
PETER ROMER-FRIEDMAN
ROBERT FRIEDMAN
GUPTA WESSLER PLLC
2001 K Street NW
North Tower, Suite 850
Washington, DC 20006
(202) 888-1741

ADAM T. KLEIN
MICHAEL J. SCIMONE
OUTTEN & GOLDEN LLP
685 Third Avenue, 25th Floor
New York, NY 10017
(212) 209-0671

*Counsel for Plaintiff-Appellant*
*(additional counsel listed on inside cover)*

March 15, 2022

MATTHEW Z. CROTTY
CROTTY & SON LAW FIRM PLLC
905 W. Riverside Avenue, Suite 404
Spokane, WA 99201
(509) 850-7011

THOMAS G. JARRARD
LAW OFFICE OF THOMAS G. JARRARD LLC
1020 N. Washington Street
Spokane, WA 99201
(425) 239-7290

# TABLE OF CONTENTS

Introduction ................................................................................ 1

Jurisdictional statement ............................................................. 5

Statement of the issue ............................................................... 5

Pertinent statutes and rules ...................................................... 5

Statement of the case ................................................................ 7

    I.    Statutory and regulatory background ................................... 7

        A.    Congress enacted USERRA to expand veterans' rights. ............ 7

        B.    Section 4316(b)(1) requires that employees on military leave be afforded the same rights and benefits generally provided to similarly situated employees on non-military leaves. ............ 8

        C.    Congress intended section 4316(b)(1) to codify *Waltermyer v. Aluminum Co. of America*, 804 F.2d 821 (3d Cir. 1986). ................... 11

        D.    The Department of Labor's implementing regulations add a comparability requirement to differentiate short-term reservist leave from "extended leave[s]" of active duty. ........... 14

    II.    Factual background ............................................................. 17

    III.    Procedural background ........................................................ 18

Standard of review ..................................................................... 22

Summary of the argument ......................................................... 22

Argument ................................................................................... 26

    I.    A reasonable jury could find that all or some of the relevant military leaves are comparable to at least one other leave. ................. 26

        A.    A reasonable jury could find that "the duration of the leave" is comparable for all or some of the military leaves. ...... 27

B.    A reasonable jury could find that "the purpose of the leave" is comparable for all or some of the military leaves. ................ 30

C.    A reasonable jury could find that "the ability of the employee to choose when to take the leave" is comparable for all or some of the military leaves. ....................................... 33

II.    The district court's opinion to the contrary misapplies the DOL regulation and summary-judgment standard, nullifies section 4316(b)(1), and violates the Rules Enabling Act. .................................. 36

A.    Duration .................................................................................... 36

B.    Purpose of the leave ................................................................ 46

C.    Ability of the employee to choose when to take the leave. ....... 47

Conclusion ............................................................................................... 49

# TABLE OF AUTHORITIES

## Cases

*Bell v. Wilmott Storage Services., LLC,*
  12 F.4th 1065 (9th Cir. 2021) ................................................................. 22

*Bouman v. Block,*
  940 F.2d 1211 (9th Cir. 1991) ................................................................ 41

*Brill v. AK Steel Corp.,*
  2012 WL 893902 (S.D. Ohio Mar. 14, 2012) ...................................... *passim*

*Brown v. Gardner,*
  513 U.S. 115 (1994) ................................................................................ 44

*City of Pomona v. SQM North America Corp.,*
  750 F.3d 1036 (9th Cir. 2014) ............................................................... 41

*Comcast v. Corp. v. National Association of African American-Owned Media,*
  140 S. Ct. 1009 (2020) ........................................................................... 43

*Davis v. Advocate Health Center Patient Care Express,*
  523 F.3d 681 (7th Cir. 2008) .................................................................. 9

*DeLee v. City of Plymouth, Indiana,*
  773 F.3d 172 (7th Cir. 2014) ............................................................... 7, 9

*E.E.O.C. v. Flasher Co.,*
  986 F.2d 1312 (10th Cir. 1992) .............................................................. 27

*Fishgold v. Sullivan Drydock & Repair Corp.,*
  328 U.S. 275  (1946) ............................................................................... 44

*Gordon v. Wawa, Inc.,*
  388 F.3d 78 (3d Cir. 2004) ..................................................................... 8

*Gross v. PPG Industries, Inc.,*
  636 F.3d 884 (7th Cir. 2011) ............................................................... 9, 11

*Huntsman v. Southwest Airlines Co.,*
  2021 WL 391300 (N.D. Cal. 2021) .............................................. 33, 47, 48

*King v. St. Vincent's Hospital,*
    502 U.S. 215 (1991) ..........................................................44

*Loughrin v. United States,*
    573 U.S. 351 (2014) .......................................................... 3

*Middleton v. City of Chicago,*
    578 F.3d 655 (7th Cir. 2009).......................................... 9

*Monroe v. Standard Oil Co.,*
    452 U.S. 549 (1981) .........................................3, 13, 25, 44

*Rivera v. Corrections Corp. of America,*
    999 F.3d 647 (9th Cir. 2021) ........................................ 22

*Rogers v. City of San Antonio,*
    392 F.3d 758 (5th Cir. 2004).....................................*passim*

*Schmauch v. Honda of America Manufacturing, Inc.,*
    295 F. Supp. 2d 823 (S.D. Ohio 2003) ........................ 23, 33

*Travers v. Federal Express Corp.,*
    8 F.4th 198 (3d Cir. 2021) ................................. 1, 10, 13, 19

*Tully v. Department of Justice,*
    481 F.3d 1367 (Fed. Cir. 2007) ..................................*passim*

*Tyson Foods, Inc. v. Bouaphakeo,*
    577 U.S. 442 (2016)......................................................4, 41, 46

*United States v. Cinemark USA,*
    348 F.3d 569 (6th Cir. 2003) ...................................... 27

*Waltermyer v. Aluminum Company of America,*
    804 F.2d 821 (3d Cir. 1986)......................................*passim*

*White v. United Airlines, Inc.,*
    987 F.3d 616 (7th Cir. 2021) .....................................*passim*

*Ziober v. BLB Resources, Inc.,*
    839 F.3d 814 (9th Cir. 2016) ..................................... 4, 22

## Statutes and rules

20 C.F.R. § 1002.104.................................................................42, 45

20 C.F.R. § 1002.150(a)......................................................6, 14, 27, 36

20 C.F.R. § 1002.150(b)...............................................................*passim*

20 C.F.R. § 1002.2.........................................................................11

28 U.S.C. § 1866(c)........................................................................34

28 U.S.C. § 2072(b)........................................................................46

38 U.S.C. § 4301(a)..........................................................................8

38 U.S.C. § 4302(b)..........................................................................9

38 U.S.C. § 4303(2).......................................................................6, 10

38 U.S.C. § 4303(12).......................................................................10

38 U.S.C. § 4311(a)........................................................................21

38 U.S.C. § 4312(e)(1)(A)(i)..............................................................38

38 U.S.C. § 4312(h).........................................................................42

38 U.S.C. § 4316(b)(1)..............................................................1, 5, 9, 10

38 U.S.C. § 4316(c)(2).....................................................................38

38 U.S.C. § 4317(a)(2).....................................................................38

38 U.S.C. § 4323(a)(1).....................................................................16

38 U.S.C. § 4323(b)(3)......................................................................5

38 U.S.C. § 4323(c)(2).......................................................................9

38 U.S.C. § 4323(h)(1).......................................................................9

38 U.S.C. § 4327(b)..........................................................................9

ID Code § 2-212 ...................................................................................34

RCWA 2.36.100 ...................................................................................34

**Other authorities**

*Black's Law Dictionary* (11th ed. 2019) ........................................... 27

H.R. Rep. 103–65 (1993) .............................................................. 7, 8, 13

S. Rep. No. 90-1477 (1968) ................................................................ 11

S. Rep. 103–158 (1993) ...................................................................... 13

70 Fed. Reg. 75246 (Dec. 19, 2005) ..................................... 15, 23, 33, 48

137 Cong. Rec. S6035 (May 16, 1991) ............................................. 8, 11

139 Cong. Rec. H2203–02 (May 4, 1993) ............................................. 7

140 Cong. Rec. S7670–71 (June 27, 1994) ............................................ 7

# INTRODUCTION

Serving in the armed forces requires balancing military and civilian life. For reservists and National Guard members, like pilot Casey Clarkson, that means taking days off work for monthly drills, annual training, and other short stints of service.

To help ease this burden, Congress enacted section 4316(b)(1) of the Uniformed Services Employment and Reemployment Rights Act of 1994 (or USERRA). 38 U.S.C. § 4316(b)(1). "It adopts a simple formula: employees who take military leave from their jobs must receive the same 'rights and benefits' provided to employees absent for other reasons." *Travers v. Fed. Express Corp.*, 8 F.4th 198, 202 (3d Cir. 2021).

Under the federal regulation implementing this provision, employees who take military leave must receive "the most favorable treatment" of any comparable leave. 20 C.F.R. § 1002.150(b). Together, the statute and regulation seek to codify *Waltermyer v. Aluminum Co. of America*, which held that a benefit given to employees on leave for jury duty, illness, bereavement, or vacation must also be given to an employee who took two weeks of military leave, because such leave "shares the essential features" of the other leaves. 804 F.2d 821, 825 (3d Cir. 1986). It is "compulsory and short." *Id.*

The regulation sets forth three factors for assessing whether "any given stretch of military leave is comparable to a form of nonmilitary leave," such that the employer must provide equal treatment. *White v. United Airlines, Inc.*, 987 F.3d 616, 625 (7th Cir. 2021). The "most significant" factor is "the duration of the leave" at issue. 20

1

C.F.R. § 1002.150(b). Thus, "[f]or instance, a two-day funeral leave will not be 'comparable' to an extended [military] leave." *Id.* In addition, "the purpose of the leave and the ability of the employee to choose when to take the leave" are relevant. *Id.* The comparability inquiry "is primarily a question of fact." *White*, 987 F.3d at 625.

Consistent with the regulation's focus on duration, courts have held that a two-year military leave is not comparable to "typically brief" non-military leaves. *Tully v. Dep't of Justice*, 481 F.3d 1367, 1370 (Fed. Cir. 2007). By the same token, courts have held that short-term military leave *is* sufficiently similar to other short-term leave—"jury duty, bereavement," and "sick leave"—to allow for a finding of comparability. *Rogers v. City of San Antonio*, 392 F.3d 758, 771–72 (5th Cir. 2004); *see Waltermyer*, 804 F.3d at 825. The federal government has adopted the same position in litigation involving the same job at issue here. *Woodall v. Am. Airlines*, No. 06-0072 (N.D. Tex.), ECF No. 25.

The decision below upends this framework. Mr. Clarkson sued Alaska Airlines and Horizon Airlines (a regional airline wholly owned by Alaska) for failing to give the same benefits to pilots on short-term military leave that they give to pilots on other, comparable leaves—namely, jury duty, bereavement, illness, and vacation. After certifying a class, the district court granted summary judgment to the airlines. It held that, when pilots take short-term military leave, they are not entitled to any of the benefits given to pilots on other leaves because military leave is not comparable to any other leave as a matter of law. Two basic errors pervade that holding:

First, it nullifies the statutory and regulatory scheme. Whereas the regulation requires assessing the particular military leaves at issue, the district court lumped *all* military leaves together—even those for which the pilots are not seeking benefits (leaves over 30 days). The court also seized on factors unmentioned in the regulation and, by focusing on characteristics specific to military leave, found them to preclude comparability entirely. For instance, although Congress sought to protect reservists during their "frequent absences from work," *Monroe v. Standard Oil Co.*, 452 U.S. 549, 565 (1981), the court viewed the frequency of reservists' military obligations as a reason to deny them any protection at all. And though reservists have long received modest government compensation, the court saw that too as reason to deny equal treatment.

All of this was error. In interpreting a regulation, a court may not add words to the regulation that are not in its text and then use those words to wipe out both the regulation and the statute it implements. Yet that is exactly what the district court did below. By focusing on factors unique to military leave, the court's decision makes it virtually impossible for any leave to ever be comparable, depriving section 4316(b)(1) of any practical effect. But the "cardinal principle" of interpretation is that "courts must give effect, if possible, to every clause and word of a statute." *Loughrin v. United States*, 573 U.S. 351, 358 (2014). To do otherwise is particularly improper here because it would nullify an important statutory provision enacted to protect servicemembers, and USERRA's provisions are "to be liberally construed" for servicemembers—not

construed out of existence. *Ziober v. BLB Res., Inc.*, 839 F.3d 814, 819 (9th Cir. 2016). So it is no surprise, then, that the court's reasoning also conflicts with the prevailing view of section 4316(b)(1) shared by other circuits and the federal government.

Nor is USERRA the only statute that the court disregarded. Although it tried to justify its approach by repeatedly pointing to the fact that this is a class action, the Rules Enabling Act makes clear that "the class device cannot 'abridge . . . any substantive right." *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 455 (2016). Rather, as the federal government's own pilot class action in *Woodall* shows, the rule is the same.

The second core problem with the court's decision is that it misapplied the summary-judgment standard. The court repeatedly ignored evidence supporting the plaintiff's claims, drew inferences against the plaintiff, resolved contested factual disputes, and made findings based on no record evidence at all. At several points, the court even ignored or contradicted the defendants' own admissions.

Under the proper standard—one that heeds the regulation's text and respects the role of both Congress and the jury—summary judgment must be denied. Mr. Clarkson produced evidence showing that the military leaves for which he seeks relief were of similar duration to the typical comparator leaves, served a similar purpose, and gave employees similar ability to choose when to take the leave. There is thus ample evidence for a jury to conclude that at least "part of" the short-term military leaves at issue are comparable to "other short-term" leave. *White*, 987 F.3d at 625.

4

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under 28 U.S.C. § 1331 because this case arises under USERRA, 38 U.S.C. §§ 4301–35. The court also had jurisdiction under 38 U.S.C. § 4323(b)(3). This Court has jurisdiction under 28 U.S.C. § 1291 because the district court granted the defendants' motions for summary judgment and entered a final judgment in their favor. 1-ER-2, 41. The district court issued its order and entered judgment on May 24, 2021, and the plaintiff timely filed a notice of appeal under Federal Rule of Appellate Procedure 4(a)(1)(A) on June 21, 2021. 6-ER-1091.

## STATEMENT OF THE ISSUE

Did the district court err in granting summary judgment to the defendants based on the view that no military leave is comparable to any type of non-military leave—as a matter of law—thus depriving section 4316(b)(1) of any effect?

## PERTINENT STATUTES AND RULES

Section 4316(b)(1) of USERRA provides:

Subject to paragraphs (2) through (6), a person who is absent from a position of employment by reason of service in the uniformed services shall be (A) deemed to be on furlough or leave of absence while performing such service; and (B) entitled to such other rights and benefits not determined by seniority as are generally provided by the employer of the person to employees having similar seniority, status, and pay who are on furlough or leave of absence under a contract, agreement, policy, practice, or plan in effect at the commencement of such service or established while such person performs such service.

38 U.S.C. § 4316(b)(1).

Section 4303(2), in turn, defines "rights and benefits" as follows:

The term "benefit", "benefit of employment", or "rights and benefits" means the terms, conditions, or privileges of employment, including any advantage, profit, privilege, gain, status, account, or interest (including wages or salary for work performed) that accrues by reason of an employment contract or agreement or an employer policy, plan, or practice and includes rights and benefits under a pension plan, a health plan, an employee stock ownership plan, insurance coverage and awards, bonuses, severance pay, supplemental unemployment benefits, vacations, and the opportunity to select work hours or location of employment.

*Id.* § 4303(2).

The Department of Labor regulation implementing section 4316(b)(1) provides:

(a) The non-seniority rights and benefits to which an employee is entitled during a period of service are those that the employer provides to similarly situated employees by an employment contract, agreement, policy, practice, or plan in effect at the employee's workplace. These rights and benefits include those in effect at the beginning of the employee's employment and those established after employment began. They also include those rights and benefits that become effective during the employee's period of service and that are provided to similarly situated employees on furlough or leave of absence.

(b) If the non-seniority benefits to which employees on furlough or leave of absence are entitled vary according to the type of leave, the employee must be given the most favorable treatment accorded to any comparable form of leave when he or she performs service in the uniformed services. In order to determine whether any two types of leave are comparable, the duration of the leave may be the most significant factor to compare. For instance, a two-day funeral leave will not be 'comparable' to an extended leave for service in the uniformed service. In addition to comparing the duration of the absences, other factors such as the purpose of the leave and the ability of the employee to choose when to take the leave should also be considered.

20 C.F.R. § 1002.150(a), (b).

6

## STATEMENT OF THE CASE

**I.    Statutory and regulatory background**

**A.    Congress enacted USERRA to expand veterans' rights.**

Congress has long recognized that when someone puts on a uniform to serve in our military, we owe them certain obligations in return. One is the assurance that, when they have discharged their duties, they will be able to return to work without being penalized for serving their country—an obligation, in other words, "to compensate for the disruption of careers and the financial setback [from] military service." 140 Cong. Rec. S7670–71 (June 27, 1994) (statement of Sen. Rockefeller).

To make good on this solemn obligation, Congress has repeatedly expanded and strengthened workplace protections in "a long line of federal veterans' rights laws enacted since the Selective Training and Service Act of 1940." *DeLee v. City of Plymouth, Ind.*, 773 F.3d 172, 174 (7th Cir. 2014). The most recent and comprehensive of these statutes is USERRA, which Congress enacted in 1994 to "strengthen existing employment rights of veterans of our armed forces." *Id.* at 174–75.

In the run-up to USERRA, Congress came to the conclusion that the existing statute was too "complex and difficult to understand," 139 Cong. Rec. H2203–02, H2209 (May 4, 1993), and that it was "sometimes ambiguous, thereby allowing for misinterpretations," H.R. Rep. 103–65(I), at 18 (1993). These misinterpretations took too narrow a view of the law, thwarting the ability of veterans and reservists to

vindicate their rights. Congress felt the need "to restate past amendments in a clearer manner and to incorporate important court decisions interpreting the law," while correcting the misinterpretations. 137 Cong. Rec. S6035, S6058 (May 16, 1991) (statement of Sen. Cranston).

The result was USERRA. The statute seeks to "clarify, simplify, and, where necessary, strengthen the existing veterans' employment and reemployment rights provisions." H.R. Rep. No. 103–65(I) at 18. Its text identifies three core objectives: (1) "to encourage noncareer service in the uniformed services by eliminating or minimizing the disadvantages to civilian careers and employment which can result from such service," (2) to "provid[e] for the prompt reemployment of such persons upon their completion of such service," and (3) "to prohibit discrimination against persons because of their service in the uniformed services." 38 U.S.C. § 4301(a). These statutory objectives have taken on "particular interest" and importance in the years since USERRA's passage "because of the large number of reservists [that were] called up for military duty as a result of the conflicts in Iraq and Afghanistan." *Gordon v. Wawa, Inc.*, 388 F.3d 78, 79–80 (3d Cir. 2004).

## B. Section 4316(b)(1) requires that employees on military leave be afforded the same rights and benefits generally provided to similarly situated employees on non-military leaves.

USERRA accomplishes its broad objectives by imposing a number of specific requirements on employers. These requirements range from "prohibiting an

employer from discriminating against a servicemember because of his service (§ 4311)" to "requiring prompt reemployment of a returning servicemember (§§ 4312, 4313(a))," to "establishing a protective period during which an employer may not discharge a reemployed servicemember without cause (§ 4316(c))." *DeLee*, 773 F.3d at 175.[1]

The requirement at issue here is section 4316(b)(1), which "sets out the rights applicable while a military employee is away from work fulfilling service obligations." *Gross v. PPG Indus., Inc.*, 636 F.3d 884, 888 (7th Cir. 2011). Section 4316(b)(1) provides, first, that "a person who is absent from a position of employment by reason of service in the uniformed services shall be (A) deemed to be on furlough or leave of absence while performing such service." 38 U.S.C. § 4316(b)(1). It then provides that the person shall be "entitled to such other rights and benefits not determined by seniority as are generally provided by the employer of the person to employees having similar seniority, status, and pay who are on furlough or leave of absence under a contract,

---

[1] To underscore the importance of these requirements, Congress created a "broad remedial scheme" for USERRA. *Davis v. Advoc. Health Ctr. Patient Care Express*, 523 F.3d 681, 684 (7th Cir. 2008). It has no statute of limitations, 38 U.S.C. § 4327(b); *Middleton v. City of Chicago*, 578 F.3d 655, 662–63 (7th Cir. 2009); it has no exhaustion requirement; it forbids fees or costs to be assessed against "any person claiming rights under [the statute]," 38 U.S.C. § 4323(h)(1); *see Davis*, 423 F.3d at 685; and it allows suit in any district where an employer has a place of business, 38 U.S.C. § 4323(c)(2). In addition, the statute "supersedes any State law (including local law or ordinance), contract, agreement, policy, plan, practice, or other matter that reduces, limits, or eliminates in any manner any right or benefit provided by" USERRA. *Id.* § 4302(b).

agreement, policy, practice, or plan in effect at the commencement of such service or established while such person performs such service." *Id.*[2]

The meaning of "rights and benefits," in turn, is supplied by section 4303(2). It defines the phrase to cover all the "terms, conditions, or privileges of employment, including any advantage, profit, privilege, gain, status, account, or interest (including wages or salary for work performed) that accrues by reason of an employment contract or agreement or an employer policy, plan, or practice." *Id.* § 4303(2). As multiple circuits have held, this broad definition, among other things, "includes pay while on leave." *Travers*, 8 F.4th at 208; *see also White*, 987 F.3d at 623. That is because "pay during leave" fits "[n]aturally" within the ordinary meaning of "advantage," "profit," and "gain," while a contrary reading would conflict with the plain text and "codified statutory purposes of USERRA." *Travers*, 8 F.4th at 205–08 & n.25.

Putting these two provisions together, sections 4316(b)(1) and 4303(2) require an employer to provide employees who take military leave with any benefit, including pay during leave, that it generally provides to similarly situated employees who take any other type of leave. The purpose of this requirement was to ensure that military leave would not be given second-class status as compared to non-military leave.

---

[2] Although not at issue in this case, USERRA defines "seniority" as "longevity in employment together with any benefits of employment which accrue with, or are determined by, longevity in employment." 38 U.S.C. § 4303(12).

### C. Congress intended section 4316(b)(1) to codify *Waltermyer v. Aluminum Co. of America*, 804 F.2d 821 (3d Cir. 1986).

This purpose is clear not only through the text of the statute, but also through its history. As noted, Congress reviewed the case law when drafting USERRA and wanted "to incorporate important court decisions interpreting the law." 137 Cong. Rec. S6035, S6058. Accordingly, "Congress emphasized when enacting USERRA that to the extent it is consistent with USERRA, the 'large body of case law that had developed' under the predecessor statutes to USERRA 'remained in full force and effect.'" *Gross*, 636 F.3d at 888 (quoting 20 C.F.R. § 1002.2).

When it comes to section 4316(b)(1), Congress intended to incorporate one case in particular—the Third Circuit's decision in *Waltermyer v. Aluminum Co. of America*, 804 F.2d 821 (3d Cir. 1986). That case involved a claim much like this one. The plaintiff was a National Guard member who was often pulled away from work for military training. *Id.* at 822. During the periods when he took military leave, his employer refused to provide him with holiday pay even though it provided that benefit to employees who took leaves at the same time for jury duty, witness duty, vacation, sickness, or bereavement. *Id.* He challenged this disparate treatment as unlawful under a provision in USERRA's predecessor statute—a provision that "was designed 'to prevent reservists and National Guardsman not on active duty who must attend week end drills or summer training from being discriminated against because of their Reserve membership.'" *Id.* at 823–24 (quoting S. Rep. No. 1477, at 102 (1968)).

The Third Circuit ruled in his favor. It explained that the statute sought "to prevent reservists and National Guardsmen not on active duty who must attend week end drills or summer training from being discriminated against because of their Reserve membership." *Id.* at 824. The statute therefore "establishe[d] equality as the test" for military leave. *Id.* Applying that test to the claim before it, the court held that the plaintiff was entitled to receive pay while on reservist leave for any holiday for which he would have received pay had he been on one of the other leaves. *Id.*

Although the plaintiff in *Waltermyer* had explicitly limited his claim to holiday pay, the logic of the court's reasoning is not so limited. As the dissent explained (and the majority did not dispute): "If a reservist and [a] juror are equal, then the reservist is not entitled to just holiday pay but to full pay for all days not worked, since employees absent for jury duty receive full pay." *Id.* at 827 (Hunter, J., dissenting).

Congress embraced *Waltermyer* when it enacted USERRA several years later. "The reports of both the Senate and the House expressed an intention to codify *Waltermyer*," *Rogers*, 392 F.3d at 768, while expressing no disagreement or discomfort with the dissent's stated recognition of the implications of doing so. Here is how the House report put it:

> The Committee intends to affirm the decision in *Waltermyer v. Aluminum Co. of America*, 804 F.2d 821 (3rd Cir. 1986) that, to the extent the employer policy or practice varies among various types of non-military leaves of absence, the most favorable treatment accorded any particular leave would also be accorded the military leave, regardless of whether the non-military leave is paid or unpaid.

H.R. Rep. 103–65(I), at 33–34. The Senate report said essentially the same. Citing *Waltermyer*, the report explained that USERRA "would codify court decisions that have interpreted current law as providing a statutorily-mandated leave of absence for military service that entitles servicemembers to participate in benefits that are accorded other employees." S. Rep. 103–158, at 58 (1993).

As noted, that's exactly what section 4316(b)(1) does. Consistent with Congress's stated desire to ensure that military leave receive "the most favorable treatment accorded any particular leave," H.R. Rep. 103–65(I), at 33, section 4316(b)(1)'s text "adopts a simple formula: employees who take military leave from their jobs must receive the same 'rights and benefits' provided to employees absent for other reasons." *Travers*, 8 F.4th at 202. "Thus, for example," as the House report explained, "an employer cannot require servicemembers to reschedule their work week because of a conflict with reserve or National Guard duty, unless all other employees who miss work are required to reschedule their work." H.R. Rep. 103–65(I), at 34.

When Congress imposed this mandate in 1994, it was fully aware of "[t]he frequent absences from work of an employee-reservist." *Monroe*, 452 U.S. at 565. Indeed, providing them with protection during those "frequent absences" was the reason that Congress enacted section 4316(b)(1) in the first place.

**D.** **The Department of Labor's implementing regulations add a comparability requirement to differentiate short-term reservist leave from "extended leave[s]" of active duty.**

After USERRA was enacted, the Department of Labor promulgated final regulations, including one intended to implement section 4316(b). The regulation, codified at 20 C.F.R. § 1002.150, has two components relevant here.

The first subsection generally tracks the statutory language and the result in *Waltermyer.* It provides that "[t]he non-seniority rights and benefits to which an employee is entitled during a period of service are those that the employer provides to similarly situated employees by an employment contract, agreement, policy, practice, or plan in effect at the employee's workplace." *Id.* § 1002.150(a).

The second subsection then tethers the "most favorable treatment" rule to a comparability analysis. It provides:

> If the non-seniority benefits to which employees on furlough or leave of absence are entitled vary according to the type of leave, the employee must be given the most favorable treatment accorded to any comparable form of leave when he or she performs service in the uniformed services. In order to determine whether any two types of leave are comparable, the duration of the leave may be the most significant factor to compare. For instance, a two-day funeral leave will not be "comparable" to an extended leave for service in the uniformed service. In addition to comparing the duration of the absences, other factors such as the purpose of the leave and the ability of the employee to choose when to take the leave should also be considered.

*Id.* § 1002.150(b).

DOL intended to ground this comparability requirement in *Waltermyer*'s observation that a two-week military leave shares the same "essential features" as the non-military leaves for which the employer had provided holiday pay, including leave for jury duty, illness, and bereavement. 804 F.2d at 825. They are "compulsory and short." *Id.*; *see* 70 Fed. Reg. 75246, 75264 (Dec. 19, 2005) ("[*Waltermyer*] found that because military leave was similarly involuntary, it was comparable to other types of involuntary absences from work and should be afforded the holiday pay."). The regulation's primary focus on "the duration of the absence[]," as well as its secondary focus on "the ability of the employee to choose when to take the leave" and "the purpose of the leave," are presumably an attempt to reflect this aspect of *Waltermyer*.

In doing so, the regulation provides a way of distinguishing between the kind of short-term reservist leave at issue in *Waltermyer* and the kind of long-term active-duty deployments that can last for months or even years on end. This appears to have been the chief concern motivating DOL to add the comparability requirement to the regulation. It emphasized "the duration of the leave" as "the most significant factor to compare," and specifically noted that "a two-day funeral leave will not be 'comparable' to an extended leave for service in the uniformed service." 20 C.F.R. § 1002.150(b). Thus, under this regulation, if an employee took two different military leaves over time—a one-year deployment and a two-day leave for drills—the former would not be comparable to funeral leave, but the latter would be a different story.

In keeping with the regulation, courts have held that a multiyear deployment is not comparable to "the typically brief duration of an absence" for leaves like jury duty, illness, and bereavement. *Tully*, 481 F.3d at 1369–71. But for short-term reservist leave of the sort at issue in *Waltermyer*, courts have generally come to the opposite conclusion, holding that neither the statute nor the regulation provides any basis for granting summary judgment to the employer based on comparability. *See, e.g.*, *Rogers*, 392 F.3d at 771–72; *Brill v. AK Steel Corp.*, 2012 WL 893902, at *6 (S.D. Ohio Mar. 14, 2012) (denying defendant's motion for summary on comparability and explaining that "annual training, weekend drills, funeral duty and VA appointments generally last between three and five days, or two and four weeks at the longest").

That is also how the federal government has applied the regulation. In 2006, the Department of Justice—which not only enforces the law for privately employed reservists, but also represents the government as a defendant in federal USERRA cases, *see* 38 U.S.C. § 4323(a)(1)—filed a class-action lawsuit on behalf of pilots against American Airlines for violating section 4316(b)(1). *Woodall*, No. 06-0072 (N.D. Tex.). Because it is one of the few enforcement actions addressing comparability, this case is instructive here.

In the lawsuit, DOJ took the position that American Airlines violated section 4316(b)(1)'s most-favorable-treatment rule because it denied certain benefits to pilots who took military leave, while providing the benefits "to pilots who took comparable

16

types of non-military leave, including but not limited to sick leave, union service leave, or jury duty leave." ECF No. 25, at 4. The airline moved to dismiss, arguing that the leaves were not comparable. But DOJ explained that "[w]hen the *proper* factors are considered, it is easy to conclude that military leave" is comparable to those other forms of leave. ECF No. 10, at 16. The court sided with DOJ and denied the motion. The parties then entered into a class-action settlement, under which the airline agreed to provide the same benefits to pilots "who take a military leave of 16 consecutive days or less," but not to pilots "who take longer leaves, such as leaves that extend for months or years," because it did not provide the same "benefits to its pilots on comparable long-term non-military leave." ECF No. 45, at 4, 15–16.

## II.    Factual background

Casey Clarkson is a veteran of the Washington Air National Guard, in which he served until June 30, 2018. 2-ER-245. While in the Guard, Clarkson also held a civilian job as a pilot—first at Horizon, from late 2013 through late 2017, and then at Alaska. 2-ER-245–46; 2-ER-233. During his employment with both airlines, Clarkson took periods of short-term military leave to perform his Guard duties. 2-ER-233; 2-ER-248.

Pilots at both Horizon and Alaska are guaranteed a certain number of hours of pay per month based on their status. 4-ER-673–74; 4-ER-599. But when pilots take military leaves, their minimum guaranteed pay is decreased for each day of leave. 4-

ER-673–74; 3-ER-334; 3-ER-367, 375; 4-ER-599. Alaska categorizes military leave up to 30 days as short-term rather than "extended" military leave. 4-ER-599; 3-ER-378; 2-ER-199–206. Horizon also distinguishes short-term from other military leaves. 3-ER-335.

Unlike short-term military leave, many forms of non-military leave are "protected from loss of pay" at both airlines, such that taking those leaves does not reduce a pilot's minimum guarantee. 5-ER-913, 955–57; 3-ER-368–70. These include leaves for jury duty, bereavement leave, sick leave, and vacation. 4-ER-604, 613, 618, 652; 5-ER-913, 956–57.

## III. Procedural background

To remedy this disparate treatment, Clarkson sued Horizon and Alaska in January 2019. He alleged that the airlines violated section 4316(b)(1) of USERRA by treating short-term military leave less favorably than other comparable leaves. 5-ER-1079–81. After denying a motion to dismiss, ECF No. 30, the district court certified a class of "all current or former Alaska or Horizon pilots who have taken short-term military leave" over a particular period. 5-ER-1050.[3]

Discovery followed, and the district court then granted summary judgment to the defendants. It did not dispute that the receipt of pay during leave is a "benefit[],"

---

[3] Clarkson asserted additional claims under USERRA (related to Horizon's virtual-credit policy) and ERISA, which have settled and are not at issue on appeal.

as multiple circuits have held. *Travers*, 8 F.4th at 208; *White*, 987 F.3d at 623. The district court instead found that none of the leaves at issue—jury duty, bereavement, sick, or vacation—is comparable to military leave as a matter of law. 1-ER-25. Although the district court purported to ground its analysis in a particular view of the record before it, the court's reasoning swept far broader. It proceeded like so:

*First*, the court resolved the parties' threshold dispute about the proper metric for comparing "the duration of the leave"—the "most significant factor" under the DOL regulation. 20 C.F.R. § 1002.150(b). The court held that the category of military leave as a whole must be analyzed—short- and long-term leave together—and that no reasonable jury could find otherwise. The court acknowledged that the text of "the DOL regulations contemplate[s] a comparison of individual military leaves," but it declined to engage in that comparison here, stating that to do so would "read unwritten words into a specific statutory provision." 1-ER-13. The court did not say, however, what specific statutory language supported its contrary view. The court also acknowledged that cases from other circuits likewise understood duration to focus on individual military leaves. But it said that it was "not inclined to apply" these cases, "particularly when the issue is presented as a class claim." 1-ER-14–15.

*Second*, having resolved this dispute against the plaintiff, the district court then turned to duration. Discovery had showed that, during the relevant time, the average duration of the military leaves at issue in this case was about three days at Alaska and

19

four days at Horizon, with medians of two days and three days, respectively. 5-ER-1001–02. And the average and median lengths of jury duty, bereavement, and sick leave at both airlines were all between two and three days. *Id*. But because the court had held that all military leave must be considered, it also considered the duration of the long-term military leaves for which the class is not seeking recovery. 1-ER-16. Even then, the court did not discuss the average or median duration of military leave (nor of vacation). It simply compared the statistical tails for each form of leave—that is, the outliers—thereby considering *only* the long-term military leave. 1-ER-16–18.

*Third*, the court did not confine its duration analysis to duration alone. Instead, it placed considerable weight on a factor not mentioned in section 4316(b)(1) or the DOL regulation: the frequency with which the leave is taken. The court thought that "frequency is useful in the duration analysis, particularly in a class setting." 1-ER-15. Then it went a step further: Rather than consider the frequency of military leave across the workforce, the court considered only its frequency among the subset of people who took it. 1-ER-17. Based on these conclusions, the court determined that there were "significant differences in duration and frequency," so "military leave is not comparable to jury duty, bereavement leave, and sick leave." 1-ER-18.

*Fourth*, the court found that the purpose of military leave "is to allow employees to pursue parallel careers" and "earn additional income," 1-ER-20–21, despite evidence showing that the purpose was to facilitate national service and civic duty,

*see* 2-ER-289; 2-ER-230–31. The court concluded that the "opportunity to . . . earn additional income" during military leave distinguished it from leave for jury duty, bereavement, and illness. 1-ER-20–21. Even though the government also provides pay to jurors, the court said that "the compensation and frequency of jury duty is not comparable to military leave." 1-ER-21.

Given what it saw as "significantly different purposes between military leave and other forms of leave," the court determined that there is "no genuine dispute of material fact as to comparability." 1-ER-22. The court did not explain how military leave could ever be comparable to another leave in its view, nor make any attempt to square its holding with the text, purpose, and history of section 4316(b)(1).

*Finally*, with respect to the third DOL factor—the ability to choose when to take the leave—the district court opined that "pilots have a greater degree of control over their ability to take military leave and schedule around such leave" than the other leaves. 1-ER-25. The court also asserted, without citation, that these leaves are more likely to occur "unexpectedly" or "without significant notice," even though this case involves military leaves that were typically unknown to pilots more than a few weeks in advance. 1-ER-24. And the court found it significant, in assessing this factor, that USERRA separately requires that all military leave be "automatically granted," which the court believed distinguishes military leave from non-military leave for purposes of comparability under section 4316(b)(1). *Id.*; *see* 38 U.S.C. § 4311(a).

## STANDARD OF REVIEW

This Court reviews a "district court's grant of summary judgment de novo, viewing the evidence in the light most favorable to the non-moving party and drawing all reasonable inferences in its favor." *Bell v. Wilmott Storage Servs., LLC*, 12 F.4th 1065, 1068 (9th Cir. 2021). The Court "will reverse a grant of summary judgment if a rational trier of fact could resolve a genuine issue of material fact in the nonmoving party's favor." *Rivera v. Corrections Corp. of Am.*, 999 F.3d 647, 651 (9th Cir. 2021) (cleaned up). Further, under precedent from "the Supreme Court and this court," USERRA is "to be liberally construed for the benefit of [the service member]." *Ziober*, 839 F.3d at 819 (cleaned up).

## SUMMARY OF THE ARGUMENT

**I.** Whether "any given stretch of military leave is comparable to a form of nonmilitary leave" is "primarily a question of fact" for the jury. *White*, 987 F.3d at 624–25. Three factors guide the inquiry: the duration of the leave, the purpose of the leave, and the ability of the employee to choose when to take the leave.

Based on these factors, a reasonable jury could find that all or some of the military leaves at issue in this case are comparable to at least one other leave.

**A.** On duration: The evidence overwhelmingly shows that the leaves were of a comparable length. None of the military leaves at issue lasted for over 30 days, and the vast majority were just a few days long. The average length was around three or

four days. By comparison, the average length of leave for jury duty, illness, and bereavement were all between two and three days, while the average length of vacation was around five to six days. By any measure these figures are comparable. Indeed, the very case that Congress and DOL sought to codify expressly held that a "leave of absence for the annual two-week military training period" was comparably "short" to other types of leaves that "would not generally be of extended duration." *Waltermyer*, 804 F.2d at 821–22, 825. A jury could find the same.

**B.** On purpose: Although this factor isn't as significant as duration, a jury could conclude that it too supports a comparability finding. The defendants admitted below that the purpose of military leave is to allow pilots to perform a public service, which is also the purpose of jury leave. And for the other comparator leaves, there is evidence showing that they are provided to pilots in part to protect public health and safety. A jury could credit this evidence and find that the purpose of military leave is sufficiently similar to this purpose to allow for a finding of comparability.

**C.** On voluntariness: Case law makes clear that military leave and leave for jury duty, bereavement, or illness are "similarly involuntary," and DOL embraced that understanding when it promulgated the comparability regulation. 70 Fed. Reg. at 75264 (describing *Waltermyer*); *id.* at 75262 (favorably citing *Schmauch v. Honda of Am. Mfg., Inc.*, 295 F. Supp. 2d 823, 837 (S.D. Ohio 2003), which held that "[b]oth military leave and jury duty are compulsory" and "beyond the control of the employee").

23

A reasonable jury could reach the same conclusion here. The evidence shows that the comparator leaves are often involuntary, but that there can be some degree of flexibility over when to take the leave (a doctor's appointment or planned surgery, for example, or deferral of jury duty). Military leave is not materially different: As the defendants conceded below, reservists and Guard members are required to fulfill their military obligations. And while they might have some flexibility over when they can take the leave, like the comparator leaves, that flexibility is limited.

**II.** In holding otherwise, the district court misinterpreted the DOL regulation, drained the statute of practical effect, and violated the summary-judgment standard.

**A.** The court's duration analysis is emblematic of these errors. Rather than analyze the length of the leaves at issue, the court lumped together all military leaves to determine whether "military leave" as a category is comparable in duration to any other category of leave. But the regulation requires analysis of the duration of the specific military leaves at issue, not all military leaves as an undifferentiated whole. The categorical approach taken below not only ignores that directive (and, in doing so, conflicts with the case law), but it also leads to an absurd result: Either *all* military leaves, whether two days or two years, are "comparable" and the employee is always entitled to benefits, or *none* are comparable and the employee is always treated worse.

The court then considered a factor not found in the regulation—the frequency with which reservists must take leave—to further distort the duration analysis. But

the frequency of reservists' military obligations provides no basis for a court to deny relief. Congress enacted section 4316(b) specifically to protect reservists during what it knew were "frequent absences from work." *Monroe*, 452 U.S. at 565.

Compounding these interpretive errors, the court then repeatedly resolved factual disputes about duration and frequency in favor of the airlines. To take just one example, the court compared the *average* length of jury leave and bereavement leave to the *longest* military leaves (even within the category of *all* military leave). The weight to afford averages and statistical anomalies, however, is a matter for the jury.

Finally, the district court attempted to ground its approach in the fact that this case is a class action. Under the Rules Enabling Act, however, the plaintiff's claim must be treated the same whether he brings it on his own or in a class action.

**B.** The court also erred in holding that the only purpose of military leave is to facilitate the pursuit of a parallel career. That is facially implausible, would thwart comparability for all military leave, and ignores the airlines' own admissions that military leave, like the other leaves, facilitates public service and the public good.

**C.** Nor is the court's analysis of the voluntariness factor correct. In the court's view, voluntariness turns on the employee's control over scheduling. But *Waltermyer* itself recognized that military leave and leave for jury duty, bereavement, and illness are similarly involuntary. Even if there is some limited flexibility to reschedule these leaves, they are all generally triggered by events outside the employee's control.

## ARGUMENT

**I. A reasonable jury could find that all or some of the relevant military leaves are comparable to at least one other leave.**

As interpreted by DOL, section 4316(b)(1) requires a plaintiff to show "that any given stretch of military leave is comparable to a form of nonmilitary leave that is accorded a benefit." *White*, 987 F.3d at 624–25; *see* 20 C.F.R. § 1002.150(b). "This is primarily a question of fact" for the jury. *White*, 987 F.3d at 625. The Fifth Circuit, for instance, reversed a grant of summary judgment because there were "genuinely disputable issues as to the material facts" of whether "jury duty, bereavement," or "sick leave" was "comparable to each plaintiff's military leaves." *Rogers*, 392 F.3d at 771–72.

This case calls for the same outcome. The class seeks to recover only for short-term military leave (30 days or fewer). So the sole issue on appeal is whether there is sufficient evidence to support a finding that these short stretches of military leave are comparable to another leave (namely, jury duty, bereavement, illness, or vacation).

There is. Applying the three factors set forth in the DOL regulation to the leaves in this case—duration, purpose, and choice—a jury could find that "all" or "part" of the military leaves are comparable to at least one other leave. *See White*, 987 F.3d at 625. The Third Circuit in *Waltermyer* itself recognized that "compulsory and short" military leave "shares the essential features" of the same comparator leaves. 804 F.2d at 825. A reasonable jury could agree.

## A. A reasonable jury could find that "the duration of the leave" is comparable for all or some of the military leaves.

The first and "most significant factor" listed in the regulation is "the duration of the leave." 20 C.F.R. § 1002.150(b). Viewing the record evidence in the light most favorable to the class, this factor cuts strongly in favor of comparability.

"Duration" means "[t]he length of time something lasts." *Black's Law Dict.* (11th ed. 2019). And "comparable" means "similar" or "roughly similar." *United States v. Cinemark USA*, 348 F.3d 569, 575–76 (6th Cir. 2003). For the "duration of the absences" to be "comparable," then, the length of time that an employee is on leave for a particular "period of service" must be similar to (or roughly similar to) the length of time away from work for an allegedly comparable leave. 20 C.F.R. § 100.150(a), (b).

But it need not be "exactly the same." *E.E.O.C. v. Flasher Co.*, 986 F.2d 1312, 1316 (10th Cir. 1992). That is not what "comparable" means, nor is it what DOL intended when it promulgated the regulation. The regulation's emphasis on "duration" serves to make clear that long-term leave (like the two-year deployment in *Tully*, 481 F.3d 1367) is to be treated differently than short-term leave (like the two-week training in *Waltermyer*). Thus, "a two-day funeral leave will not be 'comparable' to an extended leave for [military] service." 20 C.F.R. § 1002.150(b). But a three-day military leave? There, "comparing the duration of the absences," *id.*, would allow a jury to find that they are comparable. *See, e.g.*, *Brill*, 2012 WL 893902, *6 (denying summary judgment).

That is essentially what the record shows here. The vast majority of all leaves at issue in this case—military and non-military alike—lasted for just a few days. The plaintiff's expert analyzed the record evidence and calculated that, during the class period, the average duration of the military leaves at issue was approximately three days at Alaska and four days at Horizon. 5-ER-1001–02. The median leave (that is, the length of leave in the middle of the leave distribution) was two days and three days, respectively. *Id.* The modal leave (that is, the most common length of leave in the distribution) was one day and two days, respectively. *Id.* By comparison, the average, median, and modal lengths of jury duty, bereavement, and sick leave were all between two and three days at both airlines, while the average length of vacation was approximately five to six days. *Id.*

More precisely, the expert's report includes the following chart for Alaska:

| | Oct. 2004 – Dec. 2020 | | | Sept. 2013 – Dec. 2020 | | Sept. 2005 – Dec. 2020 | |
|---|---|---|---|---|---|---|---|
| | Short-Term Military | Jury Duty | Berea-vement | Short-Term Military | Sick | Short-Term Military | Vaca-tion |
| No. of Leaves | 16,465 | 2,875 | 10,562 | 7,481 | 53,194 | 15,690 | 101,359 |
| Leave Days | 51,086 | 8,460 | 29,230 | 18,731 | 134,129 | 47,575 | 613,829 |
| Avg. Days per Leave | 3.10 | 2.94 | 2.77 | 2.50 | 2.52 | 3.03 | 6.06 |
| Mode Days in leave | 1 | 3 | 2 | 1 | 2 | 1 | 1 |
| Median Days in Leave | 2 | 3 | 3 | 1 | 2 | 2 | n/a |

5-ER-1001.

The expert's report also includes the following chart for Horizon:

| | Oct. 2008 – Dec. 2020 | | | Feb. 2010 – Dec. 2020 | | |
|---|---|---|---|---|---|---|
| | Short-Term Military | Jury Duty | Bereav-ement | Short-Term Military | Sick | Vaca-tion |
| No. of Leaves | 1,808 | 514 | 656 | 1,706 | 24,883 | 21,440 |
| Leave Days | 7,647 | 1,365 | 1,629 | 7,208 | 54,045 | 110,519 |
| Avg. Days per Leave | 4.23 | 2.66 | 2.48 | 4.23 | 2.17 | 5.15 |
| Mode Days in Leave | 2 | 2 | 3 | 2 | 2 | 7 |
| Median Days in Leave | 3 | 3 | 3 | 3 | 2 | 7 |

5-ER-1002.

This is more than enough evidence to support a finding of comparability as to duration. Were a jury to credit this evidence, it could easily conclude that all—or at least some—of the relevant military leave is similar in duration to the other leaves. In fact, for most of the military leaves at issue in this case, that is the *only* reasonable conclusion. A military leave of just a few days is indisputably comparable in duration to the typical leave for jury duty, bereavement, illness, or vacation.

But even as to the longer periods of military leave at issue here, the record would support a finding of comparability as to duration. For instance, reservists and National Guard members must attend a two-week annual training, and pilots have additional obligations. Although they can try to arrange their schedules to minimize the amount of leave taken to fulfill their obligations, they might occasionally need to take leave of more than a few days. Taking five or even ten days of leave, however, is not radically different than taking three. The court in *Waltermyer* characterized the

plaintiff's "leave of absence for the annual two-week military training period" as comparably "short" to other types of leaves that "would not generally be of extended duration." 804 F.2d at 821–22, 825. In codifying *Waltermyer*, Congress left no indication that it wanted courts to be able to forbid juries from reaching the same conclusion. Nor did DOL in its regulation. Accordingly, as the Fifth Circuit held in *Rogers*, it is for the jury to determine whether "non-military leaves, not generally for extended durations," including "jury duty, bereavement," and "sick leave," are comparable to military leaves to attend the "annual two week session." 392 F.3d at 761, 771–72; *see also Brill*, 2012 WL 893902 at *6 (denying summary judgment and holding that, for military leaves that "generally last between three and five days, or two and four weeks at the longest," "[s]uch a length may be comparable to the duration of jury").

**B.    A reasonable jury could find that "the purpose of the leave" is comparable for all or some of the military leaves.**

Next is "the purpose of the leave." 20 C.F.R. § 1002.150(b). Although this factor is not as significant as duration, the DOL regulation says that it "should also be considered." *Id.* And as with duration, a jury could review the evidence and conclude that this factor supports a comparability determination for the relevant leaves.

Jury duty is perhaps the clearest example. Like military service, it entails the performance of a civic duty. *See* 3-ER-372 (Alaska Rule 30(b)(6) witness admitting that the purpose of jury-duty leave is to allow employees to "follow[] through with their civic responsibilities"). Indeed, even Alaska admitted below that one of "the purposes

of military leave" is "allowing pilots to perform a public service." 2-ER-231; *see* 3-ER-376–77 (Alaska Rule 30(b)(6) witness admitting that "we look at performing for the military as an important function for . . . the country," and as a "form of civic duty"). Suffice it to say, a jury could sensibly reach the same conclusion and find that this purpose is comparable to the purpose of providing leave for jury duty. *See, e.g.*, *Woodall*, ECF No. 10 at 16 (U.S. Department of Justice brief explaining that it would be "easy" for a jury to conclude that short-term military leave is comparable to jury leave "because both serve a public service purpose"); *Brill*, 2012 WL 893902 at *6 (denying summary judgment and holding that a jury could find that "the purposes of the leave policies are comparable").

As for the other comparator leaves, they too share a common public purpose: protecting public health and safety. Horizon and Alaska forbid pilots from reporting to work sick as a precaution to ensure that they "do [their] job safely," and to protect airline passengers and the public from the spread of disease. 2-ER-167; 2-ER-154. Bereavement leave is likewise aimed at public safety. *See* 2-ER-154 (record testimony that bereavement leave "protect[s] the safety of airline passengers who might be endangered if grief interfered with a pilot's ability to perform their job duties"). So too is vacation. It provides "rest to recuperate," which in turn helps "prevent fatigue and burnout." *Id.*

A jury could reasonably conclude that these purposes are comparable to the purpose of military leave. Because air travel is a public-transportation industry in which pilots play a critical role, these leaves serve not just the private interests of the pilot, but the public good. And they enable the airlines to achieve their goal of having the highest quality pilots in the sky. Just as sick leave, bereavement leave, and vacation seek to promote public safety by ensuring that pilots are healthy, mentally sharp, and well-rested, reservist and Guard leave do much the same. They protect the public by promoting military service—service that goes well beyond fighting wars—and they ensure that pilots remain experienced, well-trained, and fit to fly.

In any event, the purpose factor is just one of the three factors listed. And unlike duration, where the regulation gives an example of two leaves that would not be comparable based on the duration factor alone, the regulation does not require that the purpose factor separately be satisfied to allow for a finding of comparability. The text of the regulation makes that clear. As do its goals: Placing too heavy an emphasis on purpose would permit exactly the kind of anti-military value judgment that Congress sought to prohibit through section 4316(b)(1)—inviting an employer to treat two otherwise comparable leaves differently because it wishes to advance only the purpose of the non-military leave, and not the purpose of the military leave.

### C. A reasonable jury could find that "the ability of the employee to choose when to take the leave" is comparable for all or some of the military leaves.

The final factor—"the ability of the employee to choose when to take the leave," 20 C.F.R. § 1002.150(b)—strongly supports comparability. This factor asks "whether the absence is voluntary or involuntary." *Huntsman v. Sw. Airlines Co.*, 2021 WL 391300, *6 (N.D. Cal. 2021). On that question, there has long been consensus that the types of leaves at issue here are comparable.

*Waltermyer* itself recognizes that these types of leave are "similarly involuntary," 70 Fed. Reg. at 75264, and Congress codified *Waltermyer* in enacting section 4316(b)(1). After Congress did so, courts continued to recognize that "[b]oth military leave and jury duty are compulsory, beyond the control of the employee, and may last for a comparable amount of time." *See, e.g.*, *Schmauch*, 295 F. Supp. 2d at 837. DOL then specifically embraced this understanding in its rulemaking process. *See* 70 Fed. Reg. at 75262 (favorably citing *Waltermyer* and *Schmauch*, which DOL described as holding that an "employer improperly treated jury duty more favorably than military leave"). It therefore defies belief to think that a jury would somehow be prohibited from reaching the same conclusion here.

Nor does the record in this case authorize that counterintuitive result. The record includes evidence showing that sick leave, bereavement leave, and jury-duty leave are generally involuntary, even though there can be some flexibility over when

to take these leaves. For example, although no one chooses to get sick, pilots may use sick leave to attend doctors' appointments, consult with specialists, or undergo pre-arranged and elective surgical procedures, the timing of which they can control. 2-ER-159; 2-ER-168. And while death is often unexpected, pilots may use bereavement leave to attend planned memorial services, which they can schedule themselves. 5-ER-900. Likewise, while jury duty is generally involuntary, every state in which a class member resides allows deferred jury service under certain conditions. *See, e.g.*, RCWA 2.36.100 (permitting deferral of jury duty for "any reason deemed sufficient by the court for a period of time the court deems necessary"); ID Code § 2-212 (permitting postponement for various reasons). The same is true of federal jury service. *See* 28 U.S.C. § 1866(c) (permitting deferral upon showing of undue hardship). For all these leaves, then, there is an involuntary occurrence triggering an absence from work, with limited flexibility as to when the absence will be taken.

That common thread holds true for short-term military leave. Reservists are required to attend monthly drills and annual training, plus other missions or training as may be required by their commanders. Horizon itself conceded below that, once a person volunteers to serve in the reserves or National Guard, their "obligations are no longer voluntary; they're required to fulfill their reserve duties" just as jurors are required to fulfill their jury duties. 3-ER-337. As with jury duty, "[p]ilots who are reservists in the armed forces do not have control over when they are ordered to

34

perform military service." 2-ER-153. As with jury duty, they are not free to ignore the order. And as with jury duty, their ability to successfully negotiate with a government official to have their service obligations rescheduled is limited. ER-274–75; 2-ER-185–88; 2-ER-157–58.

A jury could reasonably conclude that these features make short-term leave comparable to jury duty, as well as to sick leave and bereavement leave. That is what the Third Circuit held in *Waltermyer*. 804 F.2d at 825. It is what the Fifth Circuit held in *Rogers*. 392 F.3d 758, 771–72. And it is what the Department of Justice recognized in *Woodall*. ECF No. 10 at 16 (explaining that it would be "easy" for a jury to conclude that short-term military leave is comparable to such leaves given that "the employee lacks discretion regarding when the leave can be used or how long it will last"). To the extent that a jury were to conclude that military leave preserves control on the part of the employee, or that some military leave is voluntary, that conclusion would only support a finding that such leave is comparable to vacation, which gives the employee more flexibility in deciding whether to take leave.

\* \* \*

Taken together, there is sufficient evidence of comparability—as to all four comparator leaves—to require that the issue be submitted to the jury.

This does not mean that the jury must resolve this question in an all-or-nothing way. To the contrary, the jury could find that "all, none, or only part" of the

military leaves at issue are comparable to another leave. *White*, 987 F.3d at 625. It could find, for instance, that only leaves up to 10 or 14 days are comparable. And even if the jury were to find comparability as to some leaves, the benefit in question need only be provided to the extent that it is provided for the comparable leave, and only to the extent that the leaves are comparable. So if the jury found bereavement leave were comparable, that would entitle Horizon pilots to a mere three days of paid leave per year. 5-ER-900. And if the jury found that sick leave were comparable, the amount of annual paid military leave would be subject to the same cap imposed on paid sick leave.

The point here is not that the jury will necessarily decide these questions one way or another. The point is that it's the jury's prerogative to decide them at all.

## II. The district court's opinion to the contrary misapplies the DOL regulation and summary-judgment standard, nullifies section 4316(b)(1), and violates the Rules Enabling Act.

In holding otherwise, the district court went wrong many times over. Its opinion conflicts with DOL's regulation, the summary-judgment standard, and the statute. It even manages to conflict with the Rules Enabling Act. It must be reversed.

### A. Duration

On duration, the district court refused to do the one thing that the regulation requires: compare the "duration" of the "period of service" for which the plaintiff is seeking benefits with the duration of the comparator leaves. 20 C.F.R. § 1002.150(a),

(b). The court instead applied its own view of "the duration analysis," based on its own view of the record, and determined that "military leave is not comparable to jury duty, bereavement leave, and sick leave." 1-ER-18.

In doing so, the court committed four separate errors: *First*, it incorrectly held that military leave must be treated as a "general category" for purposes of comparing duration. *Second*, it improperly weighed the evidence. *Third*, it relied on a factor not found in the regulation—the frequency with which reservists and Guard members must take military leave—and used it to defeat comparability. *Fourth*, it justified its approach by pointing to the fact that this is a class action. None of that is right.

**1.** The court's first error was analyzing "military leave as a general category of leave," without regard to the "individual military leaves" at issue. 1-ER-12–13. That view cannot be reconciled with the regulation's text or purpose, or with the case law.

The regulation's text makes clear that the comparison must focus on the length of the particular military leave at issue. It says that "a two-day funeral leave will not be 'comparable' to *an* extended leave for service in the uniform service." 20 C.F.R. § 1002.150(b) (emphasis added). The district court below dismissed that language, suggesting that it did not want "to read unwritten words into a specific statutory provision." 1-ER-13. But there is nothing in the text of the statute or the regulation that supports the court's categorical approach. And other provisions in USERRA, as the court acknowledged, draw "distinctions between short- and long-term military

leave." *Id.*; *see* 38 U.S.C. §§ 4312(e)(1)(A)(i); 4316(c)(2); 4317(a)(2). The defendants' own policies do so as well. *See* 4-ER-599; 3-ER-378; 2-ER-199–206; 3-ER-335.

The court's categorical approach would also lead to absurd results and create an unadministrable line for employers. Under that approach, short- and long-term military leave are an indivisible part of the relevant category of leave for purposes of comparing duration. So if the category of "military leave" as a whole is comparable to "sick leave," for example, an employee on a one-year military absence would have to be given the same rights and benefits as an employee on a two-day sick leave—in direct conflict with the regulation and the case law. Alternatively, if viewing "military leave" categorically meant that no other leave, as a practical matter, could ever be comparable *because* of the presence of those extended leaves, section 4316(b) would have no real effect. Either way, the result would be intolerable. And either way, an employer would be forced to constantly reevaluate its comparability determinations and leave policies depending on how many employees happen to be on long-term military leave at any given time—an unworkable and senseless state of affairs.

Nor is there any way to harmonize the district court's approach with the case law. The Seventh Circuit in *White* explained that the regulation requires comparing "any given stretch of military leave," so that some stretches of military leave might be comparable but not others. 987 F.3d at 625. The Fifth Circuit took the same approach in *Rogers*. It held that there was a material dispute of fact as to whether

"jury duty, bereavement," and sick leave "are comparable to each plaintiff's military leaves"—not the average of all military leave taken by all employees. 392 F.3d at 772.

Other cases are in accord. The Third Circuit in *Waltermyer* did not analyze whether other employees, besides the plaintiff, happened to take long-term military leave, let alone suggest that this would change the outcome. Nor did the Federal Circuit in *Tully* inquire about short-term military leave. Quite the opposite: The court rejected the argument that, under an equal-treatment rule, the same benefit "must be provided for all absences attributable to uniformed service," 481 F.3d at 1370—the upshot of the district court's approach. Instead, relying on *Waltermyer*, the court focused on "the expected length of the employee's absence" and reached a different result based on the disparity "between the typically brief duration of an absence for court duty and Mr. Tully's two and a half year absence." *Id.* at 1369–71; *see also id.* at 1370 ("The *Waltermyer* Court recognized that factors such as the duration or voluntariness of *an* absence are proper grounds for assessing similarity.") (emphasis added).[4]

---

[4] The Department of Justice has likewise adopted this interpretation. It argued in *Woodall* that pilots who take short-term military leave must be given the same benefits as pilots who take leave for jury duty and illness, because those leaves are comparable to short-term military leave. Further, the court-approved settlement in that case expressly drew a distinction between pilots who take short-term military leave ("16 consecutive days or less") and pilots "who take longer leaves, such as leaves that extend for months or years," because the airline did not provide similar "benefits to its pilots on comparable long-term non-military leave." ECF No. 45, at 4, 15–16.

The court below had little to offer in response to these cases. It said that it was "not inclined to apply the Seventh Circuit's *White* holding." 1-ER-14. It gave little weight to the holding in *Rogers*. *Id.* It did not cite *Waltermyer*. And it misread *Tully* as holding that long-term military leave makes all military leave different in "character" than any other leave—even though such a holding would render the statutory and regulatory scheme meaningless. 1-ER-15. But again, *Tully* relied on *Waltermyer* for the rule that "the benefits sought by the service member must be compared with the benefits associated with absences similar to the service member's." 481 F.3d at 1370. Applying that rule, the court focused its analysis solely on the length of "Mr. Tully's absence." *Id.* And elsewhere in its opinion, the court expressly rejected reading the comparability requirement to "negate relief under section 4316(b)(1)(B)," because that "would undermine the effect of the statute, which is designed to remedy differences in the benefits provided for military leave and leave for other purposes." *Id.*

Moreover, unlike the district court's approach, the approach taken by these cases advances the core purpose of section 4316(b)(1): ensuring equal treatment. The ultimate question is whether a plaintiff can "show[] that if he had taken a leave of absence [of a similar duration] for reasons other than military service," he would have received additional benefits. *Id.* "[C]omparing the duration of the absences"— the particular military absence, as well as the typical absence for other leaves—helps answer this question. 20 C.F.R. § 1002.150(b). The district court's approach does not.

**2.** Even setting aside its flawed legal analysis, the court independently erred by resolving contested factual disputes and ignoring evidence favorable to the class.

To give an example: The court analyzed the "average length of jury duty and bereavement leave," but not of military leave. 1-ER-16. Its analysis of military leave focused exclusively on the outer edges—the "longest military leave" and "90th percentile duration." 1-ER-16–17. In other words, the court held that long-term military leaves not only must be given weight in the comparability analysis, but that they must be given *more* weight than the length of the leaves that are actually at issue.

At summary judgment, however, courts are not permitted to resolve disputed factual issues or draw inferences against the non-moving party. Disputes over how to weigh competing views over the relevance of statistical facts, particularly when that is the subject of expert disagreement, are jury questions. *See Tyson Foods*, 577 U.S. at 459 ("Once a district court finds [expert testimony] to be admissible, its persuasiveness is, in general, a matter for the jury"); *City of Pomona v. SQM N. Am. Corp.*, 750 F.3d 1036, 1049 (9th Cir. 2014) ("Where two credible experts disagree, it is the job of the fact finder, not the trial court, to determine which source is more credible and reliable."); *Bouman v. Block*, 940 F.2d 1211, 1225 (9th Cir. 1991) ("Whether the statistics are undermined or rebutted in a specific case would normally be a question for the trier of fact."). In analyzing duration based on the record, a jury could reasonably ignore or discount long-term military leave (even assuming that

such evidence were admissible) and instead focus on the length of the leaves actually at issue. It could choose to weigh only the length of those leaves, for instance, or to weigh their mean, median, and modal length more heavily than the outlier cases. By failing to recognize these possibilities, the court ran afoul of the summary-judgment standard.

**3.** The court further erred by adding a factor to the duration analysis that is not found in the regulation, the statute, or *Waltermyer*—frequency. It did so even though it "agree[d] duration and frequency are separate measures." 1-ER-15. The court's frequency analysis is an encapsulation of its errors more broadly.

For one thing, the regulation does not mention frequency as a relevant factor *at all*—much less one with significance on par with duration. This was no oversight. When DOL adopted the regulation, it also adopted regulations implementing other provisions of USERRA, one of which says that "the timing, frequency, and duration of [a] person's training or service" in the military "shall not be a basis for denying [particular] protection[s]." 38 U.S.C. § 4312(h). DOL's implementing regulation uses the same language. 20 C.F.R. § 1002.104. That matters because it shows that the agency—when drafting the comparability regulation—knew that (1) some employers might refuse to accommodate the frequency of a reservist's military obligations, and (2) frequency and duration are distinct factors. Against this backdrop, the omission of "frequency" in the comparability regulation can only be seen as deliberate. It

would be odd, if DOL considered frequency to be of overriding significance, to have omitted it as a relevant factor. Rather, when an agency "has simultaneously chosen to [write] one [regulation] in one way and a second [regulation] in another way," courts "normally assume the differences in language imply differences in meaning." *Comcast v. Corp. v. Nat'l Ass'n of African Am.-Owned Media*, 140 S. Ct. 1009, 1018 (2020).

For another thing, to the extent that frequency may bear on comparability, it is for the jury to determine how to analyze the factor and how much weight to give it, if any. The district court twice violated this principle—first, in determining that "frequency is useful in the duration analysis, particularly in a class setting" (a separate error discussed below), and then again in applying a particular view of frequency based on selected facts from the record about how often reservists take military leave, rather than how often military leave is taken as a whole. 1-ER-15.

But a jury could easily conclude, consistent with the text of the regulation and the statute, and with cases like *Waltermyer* and *Rogers*, that frequency should be given no weight in the comparability analysis. Or it could conclude that the factor should be given some weight—but not so much as to overcome comparability on the three enumerated factors. Or it could conclude that frequency is also comparable. That's because, for Alaska pilots during the relevant periods, the frequency of short-term military leave was in the middle of the other leaves—less than sick leave, about the same as bereavement leave, and more than jury-duty leave. 5-ER-1001. And for

Horizon pilots during the relevant periods, sick leave was taken more frequently than short-term military leave, while bereavement leave and jury-duty leave were taken only about three times less frequently. 5-ER-1002. The district court simply ignored this evidence.

For still another thing, the court's particular view of frequency would make comparability with any other leave nearly impossible. When a court interprets a regulation, it may not add words to the regulation and then use them to nullify both the regulation and the statute it implements. Yet that is what the district court did. Congress enacted 4316(b)(1) to protect reservists during their "frequent absences from work," *Monroe*, 452 U.S. at 565 —including monthly drills, annual training, and other periods of mandatory service. If military leave were required to be comparable in frequency even within the category of reservists—and summary judgment were required to be granted based on this factor alone—military leave would never be comparable to *any* leave. Long-term military leave would be too long, while short-term leave would be too frequent. Neither Congress nor DOL condoned that result, and it would gut both the statute and regulation. It would also be inconsistent with *Waltermyer*, *Rogers*, and the DOJ's litigating position in *Woodall*.[5]

---

[5] The district court's reasoning is particularly improper given the rule that any "interpretive doubt is to be resolved in the veteran's favor." *Brown v. Gardner*, 513 U.S. 115, 118 (1994); *see King v. St. Vincent's Hosp.*, 502 U.S. 215, 220 n.9 (1991) ("[P]rovisions for benefits to members of the Armed Services are to be construed in the beneficiaries' favor."); *Fishgold v. Sullivan Drydock & Repair Corp.*, 328 U.S. 275, 285 (1946).

This does not mean that employers will be required to provide fully paid leave for all short-term military leave whenever they provide pay for any short-term leave that is comparable to the military leave. Section 4316(b)(1) requires equal treatment, not preferential treatment. Thus, if the benefit provided during the only comparable leave is three days of paid leave per year, only that benefit (and no more) must be provided for short-term military leave. Or, if the benefit is the difference in pay between the employee's salary and the compensation received for jury duty, say, only differential pay must be provided for short-term military leave. If the employer still has concerns about the frequency with which any particular employee is ordered to perform military service, "the employer is permitted to bring its concerns over the timing, frequency, or duration of the employee's service to the attention of the appropriate military authority." 20 C.F.R. § 1002.104. The employer may also take those concerns to Congress or to the agency. But what the employer may not do under current law is use the frequency of reservists' military leave as a basis for denying benefits altogether.

**4.** Finally, the district court was wrong to hold that its analysis was compelled because this is a class action. *See* 1-ER-15 ("[T]he Court finds the more generalized approach the appropriate standard, particularly when the issue is presented as a class claim."); *id.* (holding that "frequency is useful in the duration analysis, particularly in a class setting"). A class action is simply a procedural device. It does not—and

45

cannot—change the underlying substantive law. The district court's statements to the contrary "ignore the Rules Enabling Act's pellucid instruction that use of the class device cannot 'abridge . . . any substantive right.'" *Tyson Foods*, 577 U.S. at 455 (quoting 28 U.S.C. § 2072(b)).

### B. Purpose of the leave

The district court's errors are not limited to its duration analysis. The court also held that the purpose of military leave is "to allow employees to pursue parallel careers," and that this purpose is so "significantly different" that there is "no genuine dispute of material fact as to comparability." 1-ER-20, 22.

That cannot be right. On this factor, too, the court ignored record evidence— including admissions from the defendants—showing that the purpose of the leaves is comparable. 2-ER-230–31; 3-ER-372, 376–77.[6] And here, too, the court construed the regulation to conflict with both itself and the statute. The "purpose of the leave" cannot be defined so narrowly as to be unique to military leave, for then military leave could never be comparable to another leave.

The district court also determined that jury duty and military leave are not comparable because "any compensation provided by the government for jury duty is not comparable to the pay received for military service." 1-ER-21. The court did

---

[6] The court also ignored evidence from the defendants showing that pilots are permitted to use vacation time to earn supplemental income. *See, e.g.*, 2-ER-194–95.

not explain, however, why compensation from the government matters to the "purpose of the leave." 20 C.F.R. § 1002.150(b). More fundamentally, on that reasoning, leave for jury duty could never be comparable to military leave as a matter of law. But no court has ever held that. And such a holding would directly contradict *Waltermyer*, *Rogers*, *Schmauch*, and the federal government's own understanding of the regulation. *See also Brill*, 2012 WL 893902, at *6 (rejecting argument that military leave is incomparable to jury duty or witness leave based on difference in government pay). Worse, because no other leave provides outside compensation on par with what reservists receive, it would mean, as a practical matter, that no other leave could ever be comparable to military leave. Once again, that cannot be the law.

### C. Ability of the employee to choose when to take the leave

The district court committed more of the same errors on the third factor. It placed dispositive weight on its assertion—unsupported by the record—that "pilots have a greater degree of control over their ability to take military leave and schedule around such leave," and on the fact that "military leave is automatically granted" under USERRA. 1-ER-25. Here, as well, the court misinterpreted the relevant standard, defied the cases, usurped the role of the jury, and undermined the statute.

As another court recently explained, "*Waltermyer*'s discussion of voluntariness indicates that the appropriate measure of voluntariness is whether the employee has control over the absence." *Huntsman*, 2021 WL 391300, at *6. DOL's regulation adopts

47

this same standard, focusing on the employee's control over the leave. When it promulgated the final rule, DOL said that it was fulfilling Congress's intent to codify *Waltermyer*, which it understood as holding that, "because military leave was similarly involuntary, it was comparable to other types of involuntary absences from work," like jury duty, illness, and bereavement. 70 Fed. Reg. at 75264. "Thus, in comparing the ability of the employee to choose when to take the leave, the appropriate focus is whether the absence is voluntary or involuntary, not the level of control an employee has selecting his or her work schedule." *Huntsman*, 2021 WL 391300, at *6. Applying that standard here, a jury could readily find—consistent with *Waltermyer*, *Rogers*, and *Schmauch*—that short-term military leave is comparable to leave for jury duty, bereavement, and illness because each of these leaves is similarly involuntary.

The district court's holding to the contrary contains several musings with no citation to any record evidence. In one representative example, the court opined:

> While certain deaths may be foreseeable (e.g., a person suffering a terminal illness) and some medical appointments can be scheduled with flexibility, it is more likely that death and illness will occur unexpectedly. Similarly, jury duty also arises without significant notice. While pilots can sometimes be excused from jury duty, they have far less control over that rescheduling process than they do over the process to schedule their reservist and flight duties.

1-ER-24. The court cited no record evidence supporting any of these statements, and there is none. There is no data showing that there are more leaves for unplanned funeral services than planned memorial services or that pilots took unplanned sick

48

absences more often than planned medical appointments. Nor is there any evidence that jury duty arises without significant notice, or that pilots have "far less control" over rescheduling jury duty than military duty. Indeed, this case involves military leaves that were typically unknown to pilots more than a few weeks in advance.

Finally, the court found it significant that USERRA requires military leave to be "automatically granted," whereas the other leaves (aside from jury duty) are not automatically granted. *Id.* But this separate statutory mandate is not relevant to voluntariness. USERRA requires compliance with *all* of its provisions. Compliance with one provision does not grant employers license to disregard another.

## CONCLUSION

The district court's judgment should be reversed.

March 15, 2022

Respectfully submitted,

*/s/ Jonathan E. Taylor*
JONATHAN E. TAYLOR
DEEPAK GUPTA
PETER ROMER-FRIEDMAN
ROBERT FRIEDMAN
GUPTA WESSLER PLLC
2001 K Street NW
North Tower, Suite 850
Washington, DC 20006
(202) 888-1741
jon@guptawessler.com
deepak@guptawessler.com
peter@guptawessler.com
robert@guptawessler.com

ADAM T. KLEIN
MICHAEL J. SCIMONE
OUTTEN & GOLDEN LLP
685 Third Ave., 25th Floor
New York, NY 10017
(212) 209-0671
atk@outtengolden.com
mscimone@outtengolden.com

R. JOSEPH BARTON
COLIN M. DOWNES
BLOCK & LEVITON LLP
1633 Connecticut Ave. NW, Suite 200
Washington, DC 20009
(202) 734-7046
jbarton@blockesq.com
colin@blockesq.com

VINCENT CHANG
BLOCK & LEVITON LLP
100 Pine Street, Suite 1250
San Francisco, CA 94111
(415) 968-8999
vincent@blockesq.com

MATTHEW Z. CROTTY
CROTTY & SON LAW FIRM PLLC
905 W. Riverside Ave., Suite 404
Spokane, WA 99201
(509) 850-7011
matt@crottyandson.com

THOMAS G. JARRARD
LAW OFFICE OF THOMAS G. JARRARD LLC
1020 N. Washington St.
Spokane, WA 99201
(425) 239-7290
tjarrard@att.net

## COMBINED CERTIFICATIONS

**1. Word Count, Typeface, and Type Style:** I certify that this brief complies with the type-volume limitations of Circuit Rule 32-1(a) because the brief (as indicated by my word processing program, Microsoft Word) contains 12,736 words, excluding those portions excluded under Federal Rule of Appellate Procedure 32(f) and Circuit Rule 32-1(c). I also certify that this brief complies with the typeface requirements of Rule 32(a)(5) and type style requirements of Rule 32(a)(6) because this brief has been prepared in the proportionally spaced typeface of 14-point Baskerville.

**2. Service:** I certify that on March 18, 2022, I filed this corrected opening brief electronically via this Court's CM/ECF system (after filing the original opening brief via CM/ECF on March 15). All participants in this appeal are registered CM/ECF users and will be served by the CM/ECF system.

March 18, 2022          */s/Jonathan E. Taylor*
                                     Jonathan E. Taylor